**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**STACY ANN PATTERSON,**                    :

      **Plaintiff**                    :    **CIVIL ACTION NO. 1:07-0965**

      **v.**                    :
                                                **(MANNION, M.J.)**
**AFSCME #2456,**                    :

      **Defendant**                    :

### MEMORANDUM

Pending before the court is the defendant's motion for summary judgment filed on February 6, 2008.  (Doc. No. 32).  Based upon the court's review of the record in this case, the defendant's motion will be granted.


**I.    PROCEDURAL HISTORY**

By way of relevant background, on May 25, 2007, the plaintiff filed the instant employment discrimination action, pro se.  (Doc. No. 1).  The court considers the plaintiff's complaint pursuant to the Pennsylvania Human Relations Act, ("PHRA"), 43 Pa.Cons.Stat.Ann. §§951, et seq.; the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §§12101, et seq.; and  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-1 et seq.[1]/[2]  The matter was

---

[1]The plaintiff's complaint in this action, which lists only the PHRA as a basis for jurisdiction, appears to be a copy of the complaint which she had filed against the defendant with the Pennsylvania Human Rights Commission, ("PHRC").  That complaint was dual filed with the U.S. Equal Employment Opportunity Commission, ("EEOC").  (Doc. No. 1, Attachments).  The EEOC (continued...)

originally assigned to the Honorable Christopher C. Conner.  On August 3,

2007, the defendant filed an answer to the plaintiff's complaint. (Doc. No. 11).

By order dated September 6, 2007, the case was reassigned to the

undersigned, the parties having consented to proceed before a United States

Magistrate Judge pursuant to 28 U.S.C. §636(c)(1).  (Doc. No. 15).

Subsequent to the close of discovery, on February 6, 2008, the

defendant filed the instant motion for summary judgment, along with

supporting materials.  (Doc. Nos. 23 & 24).  The plaintiff was granted an

---

[1](...continued)
adopted the PHRC's findings dismissing the plaintiff's discrimination claim
and issued the plaintiff a right to sue letter on May 9, 2007. (Id.).  Originally,
although the plaintiff had only listed the PHRA as a basis for this court's
jurisdiction, because of the plaintiff's pro se status, the court liberally
construed the plaintiff's complaint as being filed pursuant to the PHRA and
the ADA.  The plaintiff later filed documents in which she referred to her
action as a "Title VII action," and indicated that she is ". . . seeking relief under
Title VII of the Civil Rights Act of 1964 . . . ."  Again, because of the plaintiff's
pro se status, the court will also consider the plaintiff's action pursuant to Title
VII.  The defendant has also considered the plaintiff's claim in context of Title
VII in their motion for summary judgment.  (Doc. No. 24, p.31).

[2]The court notes that the plaintiff had filed a previous action against her
former employer, the Pennsylvania Office of the Inspector General, ("OIG"),
claiming that the OIG discriminated against her by denying her training in
violation of the PHRA.  See Civil Action No. 1:05-2549.  By order dated
August 23, 2006, this court dismissed the plaintiff's action pursuant to Federal
Rule of Civil Procedure 12(b)(6) on the basis that a suit against the OIG for
violation of the PHRA was barred by the Eleventh Amendment.  The plaintiff
appealed the decision to the United States Court of Appeals for the Third
Circuit, which affirmed by opinion dated June 15, 2007.  See Patterson v. Pa.
Office of Inspector General, 243 Fed.Appx. 695 (3d Cir. (Pa.) 2007).

extension of time to respond to the defendant's motion, (Doc. No. 26), and did

so on March 19, 2008, (Doc. Nos. 27 & 28).  The plaintiff filed a supplemental

response to the defendant's motion on April 8, 2008.  (Doc. No. 30).  A reply

brief was filed by the defendant on April 10, 2008.  (Doc. No. 31).


## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the
> existence of an element essential to that party's case,
> and on which that party will bear the burden of proof
> at trial.  In such a situation, there can be 'no genuine
> issue as to any material fact,' since a complete failure
> of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other
> facts immaterial. The moving party is 'entitled to
> judgment as a matter of law' because the nonmoving
> party has failed to make a sufficient showing on an
> essential element of her case with respect to which
> she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for

its motion and identifying those portions of the record which demonstrate the

3

absence of a genuine issue of material fact.  Id.  The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Id.

## III.   DISCUSSION

In her complaint, the plaintiff alleges that she became employed by the Commonwealth of Pennsylvania's Commission on Crime and Delinquency, ("PCCD"), in 1996.  (Doc. No. 1, ¶4).  Shortly thereafter, in 1997, she became a member of PCCD's union.  (Doc. No. 1, ¶5).

On January 18, 2000, the plaintiff began a lateral position as an

4

Information Technology Technician, ("ITT"), at the OIG.  (Doc. No. 1, ¶6).

The plaintiff brings the instant action alleging that the defendant union, AFSCME #2456, discriminated against her in its representation of her with respect to various grievances filed during her employment with the OIG[3].  The plaintiff alleges that she filed at least eight grievances during her employment with the OIG, all of which were improperly handled by the defendant.  (Doc. No.1, ¶ 44).  Initially, the plaintiff claims that Grievance No. 1365, relating to her improper classification as "Information Technology Technician," was filed by the defendant on November 6, 2001, after which she did not hear anything about the grievance.  (Doc. No. 1, ¶¶45(i)).

At around the same time, on November 13, 2001, the plaintiff alleges that the defendant attempted to coerce her into accepting a "demotion" to a job title which she was not capable of performing.  (Doc. No. 1, ¶48, 58).

According to the plaintiff, Grievance No. 1385 was filed by the defendant on February 6, 2002, relating to a written reprimand she received on January 31, 2002, which was alleged to be in violation of the collective bargaining agreement.  The plaintiff claims that she received a copy of a letter dated January 14, 2003, from Bill Brenner, Council 89 Staff Representative, to Tim Clapham, Office of Administration, indicating that the grievance was being

---

[3]The plaintiff provides several pages of information relating to her employment and incidents which occurred during her employment at the OIG. (See Doc. No. 1, ¶¶7-43). However, for purposes of the instant memorandum, only the substantive allegations against AFSCME are set forth.

withdrawn "without prejudice or precedence."  (Doc. No. 1, ¶45(ii)).

Next, the plaintiff claims that Grievance No. 1407 was filed on her behalf by the defendant on June 14, 2002, relating to a one-day in-house suspension issued to her by her supervisor, Bill Barrett, in violation of the collective bargaining agreement. According to the plaintiff, there was a first-step grievance hearing on July 11, 2002, after which she did not receive any additional information on the grievance.  (Doc. No. 1, ¶45(iii)).

The plaintiff alleges that Grievance No. 1421 was filed by the defendant on August 5, 2002, relating to a five-day in-house suspension issued to her by her supervisor, Bill Barrett. This grievance was heard at a first-step grievance hearing on February 26, 2003, which was a combined hearing for the five-day suspension and her subsequent termination.  The plaintiff alleges that she received a letter from the defendant dated August 21, 2003, stating that the grievance was denied and would not be moved to arbitration.  (Doc. No. 1, ¶45(iv)).

With respect to the final specific grievance cited by the plaintiff, she alleges that Grievance No. 1464 was filed in relation to a termination letter issued to her on October 2, 2002.  The grievance was heard at the first-step grievance hearing on February 26, 2003, previously referenced.  The plaintiff alleges that the grievance proceeded to AFSCME's Eastern Joint District Committee Panel on May 5, 2003, which ended in a "deadlock" decision.  The grievance was then heard by AFSCME's State Committee Panel on July 30,

2003, which resulted in the Committee ruling that management had "just cause" to terminate the plaintiff for "unsatisfactory performance."  The plaintiff alleges that she received a letter on August 22, 2003, which informed her of the decision and indicated that she could turn the termination into a resignation.  (Doc. No. 1, ¶45(v)).

In another instance, the plaintiff alleges that a grievance was settled on her behalf before it was filed.  (Doc. No. 1, ¶46).  On this claim, the plaintiff indicates that she received a written reprimand for "unsatisfactory performance" on December 13, 2001.  She alleges that she planned to file a grievance with respect to the reprimand, but before she could do so, she received correspondence dated December 27, 2001, from Barry Walker, AFSCE District Council 89 Staff Representative, to Tim Clapham, Office of Administration, which indicated that the matter was "settled."  According to the plaintiff, attached to the letter was a copy of correspondence dated December 19, 2001, from Mr. Walker to Mr. Clapham indicating that the written reprimand was re-issued as a verbal reprimand.  Had she been consulted, the plaintiff claims that she would not have settled the claim because her performance was not unsatisfactory.

The plaintiff further alleges that the defendant refused to file a grievance which should have been filed.  (Doc. No. 1, ¶47).  Here, she claims that a grievance should have been filed with respect to a "new procedure" which was used to introduce her interim performance evaluation for the rating period of

May 13, 2002, through July 12, 2002.  The plaintiff alleges that she attempted to grieve the issue, but the Union Steward refused to file the grievance unless she was able to obtain a witness statement from an individual, Bob Metka, a Manager who allegedly witnessed the incident.  The plaintiff alleges that she was unable to obtain the witness statement and therefore the grievance was not filed.

On July 30, 2003, the plaintiff alleges that Bill Brenner, Council 89 Staff Representative, called her at home and told her that the defendant would no longer represent her in her grievances against the OIG.  (Doc. No. 1, ¶59). At that time, the plaintiff claims that he also informed her that the defendant decided not to go to arbitration regarding her termination grievance and that she would receive notification of everything via mail.  (Doc. No. 1, ¶¶60-61). On August 22, 2003, the plaintiff alleges that she received a document in the mail which stated that her grievances were denied by AFSCME's State Committee Panel with no other explanation.  (Doc. No. 1, ¶63).

As the basis for her discrimination claim, the plaintiff alleges that she suffers from hydrocephalus[4], a neurological condition with which she was

---

[4]Hydrocephalus is the accumulation of excessive amounts of cerebrospinal fluid (CSF) within the ventricles of the brain, resulting from blockage or destruction of the normal channels for CSF drainage.  Common causes include congenital lesion, (e.g., spina bifida or aqueductal stenosis), traumatic lesions, neoplastic lesions, and infections such as meningoencephalitis. Sometimes the accumulated fluid leads to increased
(continued...)

diagnosed at the age of seven.  (Doc. No. 1, ¶¶49-51).  The plaintiff alleges that her hydrocephalus has caused her to have permanent visual difficulties with "no depth perception negating through surroundings."  (Doc. No. 1, ¶52). She further alleges that she suffers from Post Concussion Syndrome as a result of a car accident on April 7, 1998, which causes her to have problems with handling simultaneous multiple tasks requiring divided attention and with short term memory.  (Doc. No. 1, ¶¶16, 49, 54-55).

According to the plaintiff, representatives of the defendant knew of her medical conditions.  Specifically, she alleges that she informed Ron Aitken, the Chief Union Steward, of her conditions in 1999, when she filed a grievance while employed at PCCD.  (Doc. No. 1, ¶56(i)).  She alleges that she informed Joe Koshinskie, Assistant Chief Union Steward, of her conditions in 2000, when she was considering filing a grievance against OIG management.  (Doc. No. 1, ¶56(ii)).  The plaintiff alleges that Mike McCarron, Union Steward, knew of her cerebral concussion in 2001 when he attended a meeting with the Reviewing Officer.  (Doc. No. 1, ¶56(iii)).  The plaintiff claims that the defendant "officially" learned of her conditions on November 13, 2001, when she met with Barry Walker, AFSCME Council 89 Staff

---

[4](...continued)
intracranial pressures. In congenital hydrocephalus, the faulty drainage of CSF from the ventricles of the brain often results in malformation of the skull and abnormal development of the psychomotor and cognitive or language skills.  Taber's Cyclopedic Medical Dictionary at 970 (19th ed.  2001).

Representative, Art Reed, President of AFSCME Local 2456, and Ron Aitken on-site at the OIG's main headquarters.  At this time, she indicates that she showed the individuals an e-mail sent to her former supervisor which explained the details of her medical conditions.  (Doc. No. 1, ¶56(iv)).

Finally, according to the plaintiff, a co-worker, Lynn Croman, without any perceived disabilities, filed a grievance regarding her unsatisfactory interim performance reviews and the defendant represented her to the point of arbitration and securing a lateral transfer.  (Doc. No. 1, ¶64).  The plaintiff concludes that the defendant's actions with respect to her own grievances were due to her "perceived disabilities."  (Doc. No. 1, ¶65).

In an attempt to demonstrate that there are no genuine issues of material fact for trial, the defendant has provided a statement of material facts, the following of which are supported by the record and uncontroverted[5]. The American Federation of State, County and Municipal District Council Employees, ("AFSCME"), Council 13, is the collective bargaining representative for approximately 45,000 employees of the Commonwealth of Pennsylvania in numerous bargaining units represented both directly and indirectly through its affiliated locals and district councils.  (Doc. No. 23, Ex.

---

[5]As noted by the defendant, contrary to Local Rule 56.1, the plaintiff has failed to file with the court a separate, short and concise statement of material facts responding to the statement of facts filed by the defendant.  However, because of the plaintiff's pro se status, the court has reviewed the materials supplied by the plaintiff to determine which of the material facts provided by the defendant are properly opposed.

10

2, ¶2; Ex. 3, ¶2; Ex. 4, ¶2; Ex. 5, ¶2[6]).

Defendant AFSCME 2456 and AFSCME District Council 89 are subordinate bodies of Council 13 and represent a bargaining unit of many professional employees working for the Commonwealth, including employees such as the plaintiff, who worked at the PCCD and OIG. (Doc. No. 23, Ex. 1, pp. 5, 37-38; Ex. 2, ¶¶2, 6; Ex. 3, ¶¶2, 6; Ex. 4, ¶¶2,6).

During the time relevant to the plaintiff's complaint, the wages, hours, and terms and conditions of employment of Commonwealth employees in bargaining units represented by Council 13 were set forth in a collective bargaining agreement entitled "Master Agreement '99-'03 between the Commonwealth of Pennsylvania and Council 13, American Federation of State, County, and Municipal Employees, AFL-CIO," ("Master Agreement"). (Doc. No. 23, Ex. 1, pp. 44-45; Ex. 2, ¶3;Ex. 3, ¶3; Ex. 4, ¶3; Ex. 5, ¶3).

The Master Agreement contains, among other provisions, a provision setting forth the grievance procedure for resolving disputes arising under the Agreement. Disputes arising under the Master Agreement that involved bargaining unit members represented by the defendant were subject to resolution through the four-step Accelerated Grievance Procedure, ("AGP"), set forth in Article 38 and Appendix G of the Master Agreement.  (Doc. No.

---

[6]For sake of clarity, the court will use the same exhibit numbering system as set forth in the defendant's materials.  However, cross-referenced exhibits are not cited herein.

23, Ex. 1, pp. 44-46; Ex. 2, ¶4; Ex. 3, ¶4).

At the first step of AGP, either the union or a bargaining unit member would file a grievance in writing to the Commonwealth employer, after which a first-step hearing would be held. If the first-step hearing did not resolve the matter, the union or member could pursue the grievance to the second step, which would be a hearing before either the East or West Joint Area Committee, ("JAC").  Each JAC is comprised of an equal number of labor and management representatives.  Decisions of a JAC, which require a majority vote, are final and binding, meaning that they cannot be grieved any further. However, in the event that a JAC deadlocked with respect to the disposition of the grievance, the grievance would then move to the third step.  At the third step, the grievance would be heard by the Joint State Committee, ("JSC"), which is also comprised of an equal number of labor and management representatives. The decision of the JSC is final and binding.  Pursuant to the AGP, a grievance may only proceed to the fourth step, arbitration, where the JSC deadlocked with respect to the proper disposition of the grievance. (Doc. No. 23, Ex. 2, ¶5; Ex. 3, ¶5; Ex. 4, ¶5; Ex. 5, ¶5).

The defendant's materials establish that plaintiff began her employment at the PCCD in 1996. (Doc. No. 23, Ex. 1, pp. 10-11). She was later transferred to the position of ITT[7].  (Doc. No. 23, Ex. 1, p. 11).

---

[7]The defendant refers to this transfer as a promotion.  Although the
(continued...)

12

In 1997, the plaintiff joined the Union[8]. (Doc. No. 23, Ex. 1, pp. 36-37). In 1999, the defendant filed Grievance No. 1179 on the plaintiff's behalf which challenged how her lunch breaks were scheduled. (Doc. No. 23, Ex. 1, pp. 102-03; Ex. 2, ¶10). Around the time that this grievance was filed, the plaintiff sought the Union's assistance in having her transferred to another Commonwealth work-site. (Doc. No. 23, Ex. 1, pp. 42-43, 107, 115; Ex. 4, ¶7). In January 2000, the plaintiff was transferred to the OIG. (Doc. No. 23, Ex. 1, pp. 10-11; Ex. 2, ¶10; Ex. 4, ¶7). As a result of her transfer, Grievance No. 1179 was withdrawn as moot. (Doc. No. 23, Ex. 1, p. 115; Ex. 2, ¶10).

During her employ with OIG, the defendant filed at least eight grievances on the plaintiff's behalf. (Doc. No. 23, Ex. 1, pp. 25, 120; Ex. 2, ¶¶9-17). On or about May 25, 2001, Grievance No. 1318 was filed which alleged that the Commonwealth employed ambiguous performance standards for evaluating the plaintiff. On or about July 25, 2001, Grievance No. 1331 was filed which alleged harassment on the part of the Commonwealth through its issuance of poor evaluations of the plaintiff. On or about August 21, 2001, Grievance No. 1335 was filed which challenged a verbal reprimand issued to the plaintiff for poor work performance. (Doc. No. 23, Ex. 1, pp. 63-65; Ex. 2,

---

[7](...continued)
plaintiff received a pay increase, she claims that this transfer was not a "promotion," but a re-classification of her position. (Doc. No. 30, p. 5).

[8]The court uses the terms "defendant" and "Union" interchangeably throughout this memorandum.

¶11).

On or about November 13, 2001, the plaintiff attended a meeting with Art Reede, the President of Local 2456, Ron Aitken, the former Chief Shop Steward to Local 2456, and Barry Walker, the former Assistant Director of District Council 89.  The plaintiff was presented with a proposal to settle the above three grievances, as well as an unfair labor practice charge filed on her behalf in the Fall of 2001 to challenge the Commonwealth's retaliation against her after she reported being sexually harassed by her former supervisor, Bernie Ortiz[9].  (Doc. No. 23, Ex. 1, pp. 63-65, 96-98; Ex. 4, ¶¶1, 10, 11).  As part of the settlement offer, the Commonwealth offered to reclassify the plaintiff as a Clerk Typist III with no loss of salary or benefits and with the opportunity for training that would facilitate her return to the title of ITT with a possible increase in pay.  (Doc. No. 23, Ex. 1, pp. 63-65, 96-98; Ex. 4, ¶12).  The plaintiff refused the offer and, as a result, the defendant settled the above grievances on other grounds providing for reduced discipline of the plaintiff.  (Doc. No. 23, Ex. 1, pp. 63-65, 95; Ex. 2, ¶12; Ex. 3, ¶14).

In the meantime, on or about November 5, 2001, the defendant also processed Grievance No. 1365 which challenged the Commonwealth's failure to promote and place the plaintiff in the proper job classification.  The

---

[9]In her complaint and opposing materials, the plaintiff characterizes this proposal as an attempt to "coerce" her into taking a position for which she was not qualified.

defendant later withdrew this grievance as being without merit based upon the fact that the Commonwealth has full discretion to promote employees and place them in certain job classifications.  (Doc. No. 23, Ex. 2, ¶13).

In addition to the grievances filed on her behalf in 2001, the plaintiff received other assistance from the defendant in 2001 in the form of filing a discrimination charge with PHRC against the Commonwealth for its unsatisfactory work evaluations.  (Doc. No. 23, Ex. 1, pp. 22-25).

In 2002, the defendant filed two grievances on the plaintiff's behalf, including Grievance No. 1385 filed on February 2, 2002, and Grievance No. 1407 filed on June 14, 2002.  Grievance No. 1385 alleged that the plaintiff's supervisor improperly imposed a written reprimand for her poor job performance, while Grievance No. 1407 alleged that the plaintiff was improperly issued a one-day suspension for poor job performance.  Both grievances received a first-step hearing under the AGP.  However, based upon the hearing with the Commonwealth, as well as the Union's own investigation, both grievances were withdrawn by the defendant as being without merit. (Doc. No. 23, Ex. 3, ¶¶1, 8-10).  The plaintiff was informed that the grievances were withdrawn by letter dated January 14, 2003.  (Doc. No. 23, Ex. 3, ¶10).

On August 2, 2002, the plaintiff was issued a five-day suspension for poor work performance.  (Doc. No. 23, Ex. 1, pp. 55-56; Ex. 2, ¶16; Ex. 3, ¶11; Ex. 4, ¶15).  The defendant filed a grievance on the plaintiff's behalf on

15

August 5, 2002, challenging her suspension.  (Doc. No. 23, Ex. 1, p. 57; Ex. 2, ¶16; Ex. 3, ¶11; Ex. 4, ¶15).

By letter dated October 2, 2002, the plaintiff was notified that she was terminated, effective October 16, 2002, for poor work performance.  (Doc. No. 23, Ex. 1, pp. 58-59; Ex. 2, ¶16; Ex. 3, ¶12; Ex. 4, ¶15).

On October 4, 2002, the defendant filed a grievance on the plaintiff's behalf, and consolidated the grievances relating to the plaintiff's five-day suspension and termination.  (Doc. No. 23, Ex. 1, pp. 53, 59; Ex. 2, ¶¶15, 17; Ex. 3, ¶¶12-13; Ex. 4, ¶15).

The first-step hearing for the consolidated grievances was scheduled for February 26, 2003.  (Doc. No. 23, Ex. 1, pp. 67-68; Ex. 2, ¶17; Ex. 3, ¶13; Ex. 4, ¶16).  The plaintiff met with Mr. Brenner, Mr. Reede, Mr. Aiken, and Mr. Koshinskie on the prior day to prepare for the hearing.  The plaintiff was informed about the AGP process, and the role of Mr. Brenner as Staff Representative.  The evidence in support of the grievances, referred to as the "grievance packet," was discussed.  This grievance packet consisted of materials provided by the plaintiff, including sixty-nine pages of eight separate witness statements written by the plaintiff attesting to her account of the events at issue which she believed to be relevant[10].  (Doc. No. 23, Ex. 1, pp.

---

[10]The defendant concedes that not all information provided by the plaintiff was included in the packet, including information which it deemed was untimely, redundant, or did not support the grievances.  (Doc. No. 23, Ex. 3, (continued...)

47, 68, 86, 89-94; Ex. 3, ¶16).

On February 26, 2003, Mr. Brenner and the plaintiff attended the first-step hearing, at which Mr. Brenner presented the Union's case in support of the grievances, including the grievance packet.  At the hearing, the plaintiff was also called upon to answer a number of questions posed by the Commonwealth's representatives.  (Doc. No. 23, Ex. 1-8; Ex. 3, ¶17).  By letter dated March 19, 2003, the Commonwealth denied the grievances at the first step.  (Doc. No. 23, Ex. 1-8; Ex. 3, ¶18).

By letter dated March 24, 2003, the defendant advanced the grievances to the second step of the AGP before the Eastern JAC.  (Doc. No. 23, Ex. 3, ¶19).  Mr. Brenner presented the defendant's case, which included the grievance packet, to the Eastern JAC panel on May 6, 2003.  The plaintiff did not attend this hearing[11].  (Doc. No. 23, Ex. 1, p. 71; Ex. 3, ¶21).  Ultimately, the Eastern JAC was unable to reach a decision by a majority vote and deadlocked.  The plaintiff was informed of the outcome, as well as the fact that the defendant would be advancing the grievances to the JSC.  (Doc. No. 23, Ex. 1, pp. 47-48, 68-71; Ex. 3, ¶22).

---

[10](...continued)
¶¶29-30).

[11]The plaintiff does not dispute that she did not attend the hearing, but claims that this was due to the fact that she was not invited to attend.  (Doc. No. 30, p. 9). This claim is immaterial as the JAC and JSC have the discretion to hear and decide a case without notice to the grievant.  (Doc. No. 23, Ex. 2-A, p. 235).

17

The JSC hearing was held on July 30, 2003, at which Mr. Brenner presented the grievance packet and argued that there was no just cause to suspend or terminate the plaintiff. The plaintiff did not attend the JSC hearing[12]. (Doc. No. 23, Ex. 1, p. 47; Ex. 3, ¶24).  On the same day, the JSC unanimously denied the grievances, finding that the Commonwealth had just cause to suspend and terminate the plaintiff.  However, the JSC offered the plaintiff the opportunity to convert her termination to a voluntary resignation. (Doc. No. 23, Ex. 3, ¶25).  Because the JSC did not deadlock, the defendant was not permitted to advance the grievances to an arbitrator under the AGP. (Doc. No. 23, Ex. 2, ¶¶ 5, 17, 18; Ex. 3, ¶¶ 5, 25, 26).

On July 30, 2003, Mr. Brenner informed the plaintiff of the JSC's decision and its offer regarding the conversion of her termination to a resignation.  He further informed the plaintiff that the JSC's decision was final and binding.  (Doc. No. 23, Ex. 1, pp. 47-48, 84-85; Ex. 3, ¶27).

By letter dated August 21, 2003, Mr. Brenner provided the plaintiff with the JSC's decision denying the grievances.  (Doc. No. 23, Ex. 1-11; Ex. 3, ¶28).  The plaintiff did not accept the JSC's offer to convert her termination to a resignation.  (Doc. No. 23, Ex. 3, ¶27).

In 2002, the defendant's materials provide that Lynn Croman, a Clerk Typist 2 at the Systems Development Support Department, ("SDS"), of the OIG, was a member of the bargaining unit represented by Local 1420 and

---

[12]See n.11.

District Council 90, not the defendant.  (Doc. No. 23, Ex. 1, pp. 116-17; Ex. 5, ¶8).  On or about November 20, 2002, Ms. Croman received an overall unsatisfactory interim performance evaluation for the period September 2002 through November 2002.  Ms. Croman disagreed with the evaluation.  (Doc. No. 23, Ex. 5, ¶11).

In December 2002, Ms. Croman received a letter of alternative discipline in lieu of suspension without pay for her alleged continued unsatisfactory work performance. (Doc. No. 23, Ex. 5, ¶12). The Union, Local 1420, filed a grievance on behalf of Ms. Croman challenging the letter of alternative discipline. (Doc. No. 23, Ex. 5, ¶13). That same day, Ms. Croman requested a lateral transfer from her position as a Clerk Typist 2 at the SDS to another work-site.  In her letter, Ms. Croman claimed that she would be unable to perform her job duties at an acceptable level at SDS.  (Doc. No. 23, Ex. 1, pp. 115-18; Ex. 5, ¶14). Nichelle Chivis, a Staff Representative for District Council 90, worked the Commonwealth to arrange for Ms. Croman's requested transfer. Ultimately, Ms. Chivis found another individual in a Clerk Typist 2 position at the Bureau of Fraud Prevention and Prosecution, ("BFPP"), at the OIG, who was willing to vacate her position for Ms. Croman. (Doc. No. 23, Ex. 5, ¶¶ 15-18).  As a result, the Union and the Commonwealth agreed to settle the grievance filed on behalf of Ms. Croman.  As part of the settlement, Ms. Croman was reassigned to the newly vacated Clerk Typist 2 position at BFPP.  However, Ms. Croman's disciplinary letter remained in her personnel

19

file and management continued to monitor her performance and was entitled to conduct interim evaluations as needed.   (Doc. No. 23, Ex. 5, ¶19). Because the grievance was settled, a first-step hearing under the AGP did not take place.  (Doc. No. 23, Ex. 5, ¶20).

Finally, the defendant's materials provide that Union officials had knowledge that the plaintiff suffered from certain medical conditions and that in the late 1990s she was in a car accident and suffered from some physical ailments as a result of the accident. However, the defendant's materials provide that Union officials did not regard the plaintiff as disabled. (Doc. No. 23, Ex. 3, ¶31; Ex. 4, ¶17).

In response to the defendant's materials, the plaintiff filed the several documents.  Initially, she filed the amended complaint filed in her previous civil action for employment discrimination pursuant to the PHRA against the OIG[13].  In addition, she filed a copy of her deposition transcript with attached exhibits[14].  Finally, she provided copies of Employee Performance Reviews for the rating periods of July 1995 to June 1996; February 1996 to August 1996; and July 1996 to June 1997.  As discussed below, these documents are insufficient to refute the defendant's materials and establish that a genuine issue of fact exists for trial.

---

[13]See n.2.

[14]These exhibits were provided by the defendant in support of its motion for summary judgment.  See Doc. No. 23, Ex. 1.

Initially, the defendant argues that because the plaintiff filed her complaint with the PHRC on January 12, 2004, she is limited to challenging its representation of her to the last two grievances heard before the JSC on July 30, 2003, by virtue of the applicable statute of limitations under the ADA and PHRA.

In order to determine which events the plaintiff may rely on to support her ADA and PHRA claims, the court must review the various statutes of limitations which apply to her claims. In Pennsylvania, charges of disability discrimination under the ADA must be filed with the EEOC within 300 days of the alleged unlawful employment practice. Bullock v. City of Philadelphia, 250 Fed.Appx. 512 (3d Cir. (Pa.) 2007)(citing Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir.2000); 42 U.S.C. §12117(a)).  Claims filed under the PHRA must be filed with the PHRC within 180 days after the alleged act of discrimination. 43 Pa. Cons.Stat. § 959(g).

The plaintiff filed her charge of discrimination with the PHRC, which was dual filed with the EEOC, on January 12, 2004.  (Doc. No. 23, Ex. 1, p. 32). As a result, to prevail on her ADA claim, the plaintiff may only point to alleged discriminatory acts which occurred on or after March 19, 2003, 300 days before she filed her charge of discrimination.  Under the PHRA, she may only rely on events that occurred on or after July 17, 2003, 180 days before her administrative filing.

In her opposing materials, the plaintiff does not contest the filing dates

21

or applicable statutes of limitations raised by the defendant.  Further, she raises no claim that equitable tolling should apply to her claims.  Therefore, the court finds that the plaintiff is limited to challenging its representation of her to the last two grievances filed concerning her five-day suspension and termination.

In considering the plaintiff's ADA and PHRA[15] claims, the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. §12112(a).

Because there is no direct evidence of discrimination in this case, the analytical burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to the plaintiff's ADA and PHRA claims.  See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 668 (3d Cir.1999). Therefore, to establish her claims, the plaintiff has the burden of first establishing a *prima facie* case of discrimination by showing: (1) she is a

---

[15]The "analysis of an ADA claim applies equally to a PHRA claim." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir.1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996)).  Therefore, the court will consider both claims together. Cf. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004).

disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  Turner v. Hershey Chocolate U.S., 440 F.3d 604 (3d Cir. 2006)(citing Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998))[16].

If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).  If the defendant can articulate such a reason, the burden shifts back to the plaintiff, who must produce "sufficient evidence to raise a genuine issue of fact as to whether the [defendant's] proffered reasons were not its true reasons for the challenged employment actions." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir.1996).

The defendant argues that the plaintiff's ADA and PHRA claims must fail because she cannot establish the first and third prongs of the *prima facie* analysis.  With respect to the first prong, (i.e., that the plaintiff is a disabled individual within the meaning of the ADA), the ADA defines a "disability" as

_____

[16]Although the cases cited herein setting forth the *prima facie* elements of a discrimination claim, as well as the application of those elements, relate to claims of discrimination against an employer, they apply equally to the defendant labor union which is also considered a "covered entity" under the ADA. See 42 U.S.C. 12112(b)(2).

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) having a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2).

Here, while the plaintiff does not specify in her complaint the subsection upon which she relies in claiming that she is disabled under the ADA, she testified at her deposition that she is claiming that the defendant discriminated against her because of her "perceived disabilities." The plaintiff further testified that none of her physicians have opined that her conditions constitute disabilities. (Doc. No. 23, Ex. 1, p. 127). As such, it would appear that the plaintiff is basing her claim of disability upon subsection (C). In the instant motion for summary judgment, the defendant has made the same assumption and analyzed the plaintiff's claim under subsection (C). The plaintiff does not argue otherwise in her opposing brief.

Under subsection (C), the plaintiff would be "regarded as having such an impairment" if she: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments defined in paragraph (h)(1) or (2) of this section [defining "physical or mental impairment"] but is treated by a covered entity as having a substantially

limiting impairment.  29 C.F.R. §1630.2(l); see also Buskirk v. Apollo Metals, 307 F.3d 160, 166-67 (3d Cir. 2002) (quoting and applying this definition).

In order to determine whether the defendant regarded the plaintiff as disabled, we must consider the information that the defendant had regarding the plaintiff's condition and its response to that information, as "[t]he analysis "focuses not on [the plaintiff] and [her] actual disabilities, but rather on the reactions and perceptions of the persons interacting or working with [her]." Kelly v. Drexel Univ., 94 F.3d 102, 108-09 (3d Cir.1996) (stating that the "mere fact that [the defendant] is aware of an employee's impairment is insufficient to demonstrate . . . that the [defendant] regarded the employee as disabled").  "[I]n general, [a defendant's] perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim." Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3d Cir.1999).

Here, there is no dispute that the plaintiff has medical conditions, including hydrocephalus and Post Concussion Syndrome.  There is also no dispute that Union officials knew of the plaintiff's conditions.  However, as stated above, the mere fact that Union officials knew of the plaintiff's impairments is insufficient to demonstrate that the Union regarded her as disabled.  Instead, it is how the Union reacted to or acted in the face of this knowledge which is of importance.  Although the Union knew of the plaintiff's medical conditions, the record demonstrates that the Union filed numerous grievances on the plaintiff's behalf seeking to challenge disciplinary action

taken against her and to maintain her employment.  Of relevance here, the Union represented the plaintiff with respect to her five-day suspension and subsequent termination to the full extent allowed by the AGP.  These actions are not indicative that the Union believed the plaintiff to be substantially limited in any major life activity or unable to perform a wide range of jobs.  To the contrary, the Union's attempts at maintaining the plaintiff's employment is indicative that the Union believed she was, in fact, capable of performing her work. There is nothing in the record to indicate to the contrary.

Moreover, under the third prong of the *prima facie* analysis, the plaintiff must establish that she suffered adverse action as a result of discrimination. Here, the plaintiff claims that the adverse action was the defendant's failure to take her consolidated grievances relating to her five-day suspension and termination to arbitration.  There is no evidence on the record to demonstrate that the defendant's failure to do so was the result of discrimination.  Instead, the record demonstrates that the defendant failed to take the plaintiff's grievance to arbitration because it was barred from doing so by the AGP, as the JSC did not deadlock and had unanimously decided that the plaintiff's suspension and termination were supported by just cause.

In light of the above, the court finds that the plaintiff has failed to establish a *prima facie* case under the ADA and PHRA.  Based upon this finding, the court need not proceed with the remaining McDonnell Douglas analysis.  Therefore, the defendant's motion will be granted with respect to the

plaintiff's ADA and PHRA claims.

To the extent that the plaintiff is seeking relief pursuant to Title VII[17], in enacting Title VII, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin.  See Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974); McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973); Griggs v. Duke Power Co., 401 U.S. 424, 429-430 (1971).

In her complaint, the plaintiff alleges that "[her] protected class is Perceived Disability Hydrocephalus and Post Concussion Syndrome." (Doc. No. 1 ¶57).  Disability is not a protected trait under Title VII.  See 42 U.S.C. §2000e-2; Gurmankin v. Costanzo, 626 F.2d 1115, 1127 (3d Cir.1980).

Moreover, the plaintiff states in her complaint and deposition testimony that she had an "intimate" relationship with her former supervisor, Bernie Ortiz, (Doc. No. 1, ¶23), and that the Union retaliated against her for blowing the whistle on Mr. Ortiz for sexual harassment, (Doc. No. 23, Ex. 1, p. 143). The plaintiff claims that, after she blew the whistle on Mr. Ortiz, there was an internal investigation and Mr. Ortiz was forced to retire. The plaintiff states in her deposition testimony that the Union assisted the Commonwealth in retaliating against her for blowing the whistle on Mr. Ortiz "[b]y not fighting for

---

[17]Title VII also authorizes a cause of action against labor organizations. See 42 U.S.C. §2000e-2.

[her]."  (Id.).

Title VII makes it an unlawful employment practice for a labor union to retaliate against a member.  42 U.S.C. §2000e-3(a).  To establish a *prima facie* case of retaliation, the plaintiff must demonstrate: (1) she participated in a protected activity known to the Union; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.  See Torres v. Pisano, 116 F.3d 625, 639 (2d Cir.1997), cert. denied, 522 U.S. 997 (1997); Johnson v. Palma, 931 F.2d 203, 207 (2d Cir.1991).

Here, the plaintiff has provided no evidence, which would establish that her filing of the sexual harassment claim against Mr. Ortiz caused the Union not to bring her final grievances to arbitration.  In fact, there is no evidence on the record other than that the Union's failure to pursue the grievances was due to its inability to do so under the AGP. Therefore, the defendant is entitled to summary judgment on the plaintiff's Title VII claim as well.

## IV.   CONCLUSION

Based upon the foregoing, an appropriate order shall issue granting the defendant's motion for summary judgment.



s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:**  May 14, 2008

O:\shared\MEMORANDUMS\2007 MEMORANDUMS\07-0965.01.wpd

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STACY ANN PATTERSON,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 1:07-0965** |
| **v.** | : | **(MANNION, M.J.)** |
| **AFSCME #2456,** | : | |
| **Defendant** | : | |

## O R D E R

Based upon the memorandum issued this same day, **IT IS HEREBY**
**ORDERED THAT:**

(1)     the defendant's motion for summary judgment, **(Doc. No.**
        **32)**, is **GRANTED**; and

(2)     the order of May 5, 2008 granting a stay of this action **(Doc.**
        **No. 35)** is **Vacated**.

(3)     the Clerk of Court is directed to enter judgment in favor of the
        defendant, AFSCME #2456, against the plaintiff, Stacy Ann
        Patterson and close the case.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Date:** May 14, 2008

O:\shared\MEMORANDUMS\2007 MEMORANDUMS\07-0965.01.wpd